# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

   Plaintiff,

v.

BRYAN S. DUNCAN,

   Defendant,

Case No. 18-40030-01-HLT

## MEMORANDUM AND ORDER

    The two-count indictment charges Defendant Bryan S. Duncan with distribution and possession of child pornography. Shortly after Mr. Duncan was arrested in March of 2018, the court held a pretrial detention hearing. The court ordered Mr. Duncan detained pending trial, and he has remained in custody since. On July 9, 2019, he appeared in court and, pursuant to a plea agreement, pleaded guilty to possession of child pornography (Count 2). The remaining Count 1 for distribution of child pornography remains subject to dismissal at sentencing. This matter now comes before the court on his Motion for Release from Custody Prior to Sentencing. (ECF No. 58.) While Mr. Duncan awaits sentencing, he seeks temporary release pursuant to 18 U.S.C. § 3145(c) because he contends he is at an increased risk of contracting the virus that causes the disease COVID-19 while he is incarcerated and because his HIV-positive status puts him at an increased risk of suffering severe illness if he were to become infected. He also invokes the "compelling reasons" standard under 18 U.S.C. § 3124(i).

    Mr. Duncan's concerns regarding COVID-19 are legitimate and are also felt by inmates across the county as well as society at large. But that does not change the applicable legal standards. He is subject to mandatory detention, which means that § 3145(c) requires him to show

by clear and convincing evidence that, if he were released, he is not likely to flee or pose a danger to the safety of others. He has not met this burden. Mr. Duncan previously tried to flee arrest and still presents a serious flight risk. He also poses a danger to the safety of others as a twice-convicted sex offender who plans to reside—in the midst of the COVID-19 pandemic—with his 78-year-old mother who has underlying health issues. On this basis alone, the court denies Mr. Duncan's motion pursuant to § 3145(c).

The court also denies Mr. Duncan's motion pursuant to § 3124(i) because that statute does not apply to defendants who are subject to mandatory detention pending sentencing. But even if that statute did apply, Mr. Duncan has not demonstrated a compelling reason such that his release is necessary under the *Clark* framework. With no confirmed cases of COVID-19 or an unmanaged outbreak at the facility that houses Mr. Duncan and more than 3,000 confirmed cases in the state where he seeks to reside, it would be speculative to say whether the release plan he proposes truly mitigates Mr. Duncan's health risks rather than potentially exacerbating them. Moreover, Mr. Duncan's release plan increases the health risks to others. For these reasons, explained in more detail below, Mr. Duncan's motion is denied.

## I. BACKGROUND

On March 7, 2018, a grand jury returned a two-count indictment charging Mr. Duncan with possession and distribution of child pornography. (ECF No. 1.) He appeared in front of Magistrate Judge K. Gary Sebelius on March 27, 2018, for a detention hearing. (ECF No. 10.) The government proffered that the Federal Bureau of Investigations had determined that a computer eventually associated with Mr. Duncan was using a file-sharing program to share sexually explicit images of minors, including at least one video depicting an adult male digitally penetrating a female infant. (*See also* ECF No. 63 (relaying a similar set of facts).) Investigators

executed a search warrant on Mr. Duncan's residence. They found additional electronic devices underneath his bed that contained other sexually explicit images and videos of minor children.

When the U.S. Marshal's Service ("USMS") and other task force officers ("TFO") arrived at Mr. Duncan's apartment with an arrest warrant on March 21, 2018, members of the USMS knocked on Mr. Duncan's third-floor apartment door while other officers went to the rear of the building. They found Mr. Duncan hanging from a second-floor balcony, attempting to flee. Mr. Duncan ultimately fell on top of a TFO, who sustained minor injuries to the bridge of his nose.

At the detention hearing, the government urged the court to consider Mr. Duncan's prior criminal history and his history of failing to comply with conditions. Mr. Duncan was previously convicted in 2005 of possession and receipt of child pornography. He was sentenced to 36 months imprisonment. In 2009, while he was still on probation for his earlier child pornography conviction, he was convicted of credit card fraud. According to the government, five different times he faced a motion to revoke probation, including two allegations of failing to appear. He was on supervision for that conviction when he committed the currently charged offenses.

The court ordered Mr. Duncan detained pending trial. (ECF No. 11.) The court found by a preponderance of the evidence that no condition or combination of conditions would reasonably assure Mr. Duncan's appearance because he posed a serious flight risk. (*Id.* at 1.) In making that determination, the court considered the nature and circumstances of the offenses charged and the fact that the offenses involved minor victims. (*Id.* at 2.) The court also considered Mr. Duncan's history and characteristics, making specific findings as follows: Mr. Duncan appears to have a mental condition that may affect whether he will appear; he has engaged in criminal activity while under supervision; he has a significant prior criminal record; he has a record of failing to appear at court proceedings and a record of failing to comply with conditions of probation. The court

specifically noted that, at the time of arrest, Mr. Duncan was already on probation and jumped from a third-floor balcony in an attempt to evade arrest. (*Id.*) Mr. Duncan has remained in USMS custody since the court ordered him detained.

Mr. Duncan ultimately entered into a plea agreement. On July 9, 2019, he pleaded guilty to Count 2 of the indictment—possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), which carries a maximum sentence of not more than 10 years imprisonment. (ECF Nos. 42, 43.) It is undisputed that this offense subjects him to mandatory detention pending sentencing pursuant to 18 U.S.C. § 3143(a)(2). Mr. Duncan currently awaits sentencing, which the district judge postponed to May 12, 2020, in accordance with this court's Administrative Order 2020-3. That order restricts certain non-emergency criminal hearings in light of the recent outbreak of coronavirus disease ("COVID-19") caused by the virus SARS-CoV-2.

COVID-19 is also the basis for Mr. Duncan's current motion for release. Mr. Duncan is housed at the Leavenworth Detention Center in Leavenworth, Kansas, operated by CoreCivic. He argues his HIV-positive status puts him at a higher risk of becoming seriously ill from COVID-19 and that he is unable to follow social distancing recommendations to avoid infection because he is incarcerated. He further argues that crowded prison facilities create an ideal environment for virus transmission; that CoreCivic lacks the resources to engage in adequate screening and testing of inmates, correctional staff, and other care and service providers entering the facility; and that CoreCivic's current measures are inadequate to stop an outbreak at Leavenworth. Mr. Duncan proposes that the court release him to live with his mother in St. James, Missouri, and mandate location monitoring.

## II.     THE "EXCEPTIONAL CIRCUMSTANCES" PROVISION OF § 3145(c)

In 1990, Congress enacted the Mandatory Detention for Offenders Convicted of Serious Crimes Act ("the Mandatory Detention Act") as an amendment to the Bail Reform Act to require detention of defendants found guilty (or pleading guilty) to offenses described in 18 U.S.C. § 3142(f)(1)(A)-(C) pending their sentencing hearings. 18 U.S.C. § 3143(a)(2). The crime to which Mr. Duncan has pleaded guilty fits within § 3142(f)(1)(A). Therefore, he is subject to mandatory detention under § 3143(a)(2).

Mr. Duncan now moves for release prior to sentencing pursuant to 18 U.S.C. § 3145(c). That statute provides in pertinent part as follows:

> A person subject to detention pursuant to section 3143(a)(2) . . . and who meets the conditions of release set forth in section 3143(a)(1) [governing release or detention pending sentencing] or (b)(1) [governing release or detention pending appeal], may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c). For Mr. Duncan to obtain release under this section, he must meet both of the conditions set forth in § 3143(a)(1), *and* he must make "a clear showing of exceptional reasons why his detention would not be appropriate." *United States v. Kinslow*, 105 F.3d 555, 557 (10th Cir. 1997). Under § 3143(a)(1), he must show "by clear and convincing evidence, that he [is] not [1] 'likely to flee or [2] pose a danger to the safety of any other person or the community if released.'" *Id.* (quoting 18 U.S.C. § 3143(a)(1)).

### A.     Risk of Flight

Mr. Duncan has not shown by clear and convincing evidence that he is not likely to flee if he were released from custody. At the detention hearing more than two years ago, the court found that he was a flight risk largely because he attempted to flee during his arrest. Specifically, at the time of the arrest, Mr. Duncan was already on probation and jumped from a third-floor balcony in

an attempt to evade arrest. (*Id.*) He now tries to downplay that as an "impulsive decision." He argues that, since then, he has had an exemplary record while in custody. He says he has no disciplinary record, he has completed several programs to better himself, and he has even participated in group therapy as a leader. (ECF No. 58.) While the court commends Mr. Duncan on his efforts while in custody, whether he may have a spotless record while he has been incarcerated is insufficient to establish that he will appear as required if he were released. In addition to his attempt to free from arrest, the court previously found that he appears to have a mental condition that may affect whether he will appear and he has a record of failing to appear at court proceedings. The fact that Mr. Duncan is now facing a lengthy prison sentence—instead of the mere possibility of one—only heightens the risk of non-appearance.

### B. Risk of Harm to Others

Mr. Duncan also does not address whether he would pose a danger to the safety of any other person or the community. Although the court did not detain Mr. Duncan on those grounds, it is Mr. Duncan's burden on this motion to establish by clear and convincing evidence that he would not pose a danger to the safety of any other person or the community if he were released. He has not done so.

First, Mr. Duncan's release would pose a risk of harm to the children who are victims in the child pornography industry. Mr. Duncan is a twice-convicted sex offender. He was first arrested for possession and receipt of child pornography at the age of 20, court martialed, sentenced to three years of incarceration, and dishonorably discharged from the United States Marine Corps. He is now required to register as a sex offender and has twice been charged with failing to do so. And, at the age of 32, he was arrested for the current charges against him for distribution and possession of child pornography. Because Mr. Duncan is apparently still inclined to engage in the same type of conduct for which he previously served three years in prison, and for which he is

6

required to register as a sex offender, the court does not believe he will refrain from consuming child pornography if he is released. This consumption is not a victim-less crime, as evidenced by the Pre-Sentence Investigation Report that the court has carefully reviewed. (ECF No. 55.) Although the court did not previously rely on this consideration to support its detention decision, Mr. Duncan has now pleaded guilty to the offense and therefore it is appropriate to consider his recidivism.

Second, at this procedural juncture it is also appropriate to consider the COVID-19 risks to others associated with Mr. Duncan's proposed release plan. As the government notes, the Adam Walsh Act requires certain additional conditions for Mr. Duncan's release, including electronic monitoring, travel restrictions, and a curfew. These conditions would require supervising pretrial services officers to conduct at least monthly in-person inspections of the equipment worn by Mr. Duncan and the equipment in his residence, increasing travel and contact for the supervising officer. *See United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (noting risks of location monitoring to pretrial services officers given the current recommendations regarding social distancing); *see also United States v. Jackson*, No. 18-216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) (considering the "substantial burden" placed on the U.S. Probation Office "at a time when conditions already are not conductive to such monitoring").

Mr. Duncan's proposed release plan would also increase COVID-19 risks to his mother, with whom he plans to live. She is 78 years old and has a pre-existing heart condition that would make her more susceptible to the virus if she contracted it. She has been self-quarantining at home since March 12, and has only left the house for food and prescriptions. She has had no visitors. If the court were to release Mr. Duncan from custody, she would travel from St. James to provide

him with a ride home, which is an approximately four-hour drive each way. Such travel would inevitably present social distancing challenges. Picking Mr. Duncan up from CoreCivic will also increase her risks of contamination if he has already been exposed to the virus. Once Mr. Duncan is in her home, he will have to leave the home at least occasionally—to go to the local Sheriff's Office to fill out paperwork to register as a sex offender, to travel within the community for medical treatment associated with managing his own health issues, and to report to the Pretrial Services Office in St. Louis to have his location monitoring equipment installed. All of this will present social distancing challenges and, after Mr. Duncan himself has exposed himself to opportunities for contamination, he will return back to his mother's house and bring those risks of contamination with him to his 78-year-old mother with underlying health conditions.

The likelihood that Mr. Duncan will not comply with his conditions of release also increases the COVID-19 risks to others. At the detention hearing, the court considered Mr. Duncan's history of failing to comply with conditions of supervision. Magistrate Judge Sebelius noted that Mr. Duncan was on probation at the time of his arrest in this case. And, in the midst of the offenses discussed above, he was convicted of credit card fraud and had his probation for that charge revoked and/or suspended multiple times. All total, he has spent nearly his entire adult life either committing crimes, serving time in prison, and/or violating conditions of court-ordered supervision. Mr. Duncan does not provide the court with any reason to believe that, if he were released, he would comply with conditions of release. In the midst of the COVID-19 pandemic, a "defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody." *See United States v. Clark*, No. 19-40068-

01-HLT, 2020 WL 1446895, at *7 (D. Kan. Mar. 25, 2020). And because of the likelihood that Mr. Duncan would flee or violate other conditions of release, his release would pose additional risks to law enforcement officers, who would be forced to expend valuable resources during a national crisis to take him back into custody. As Mr. Duncan himself notes, "[a]s additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into CoreCivic, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions." (ECF No. 58, at 6.) This applies equally to Mr. Duncan, who will present a risk of harm to others when he inevitably returns to CoreCivic after having had abundant opportunity for contamination.

\* \* \* \* \*

Because Mr. Duncan has not established that he meets the conditions set forth in § 3143(a)(1), the court cannot grant the motion for release under § 3145(c). *See United States v. Dahda*, 772 F. App'x 730, 732–33 (10th Cir. 2019) (finding that a defendant did not carry his burden to establish by clear and convincing evidence that he met the conditions for release under § 3143(a)(1) where defendant offered no evidence and finding that the motion would fail on this basis alone).

### III. "COMPELLING REASON" STANDARD UNDER § 3142(i)

Mr. Duncan also relies on 18 U.S.C. § 3142(i) of the Bail Reform Act. It provides in relevant part that:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary* for preparation of the person's defense or *for another compelling reason*.

§ 3142(i) (emphasis added).

### A. § 3142(i) Does Not Apply to Individuals Seeking Release Pending Sentencing

Other district courts have held that § 3142(i) only applies to a person seeking release pending trial. Release pending sentencing, as relevant here, is governed by 18 U.S.C. § 3143. *See, e.g.*, *United States v. Felix*, Case No. 5:19CR711, 2020 WL 1677494, at *2 (N.D. Ohio Apr. 6, 2020) (finding § 3142(i) does not apply to individuals seeking release pending sentencing because of COVID-19; rather, § 3145(c) governs); *United States v. McDuffie*, No. 19-CR-212, 2020 WL 1659879, at *1 (S.D.N.Y. Apr. 3, 2020); *United States v. Harris*, Case No. 19-356, 2020 WL 1503444 (D.D.C. Mar. 27, 2020) (same); *United States v. Rollins*, Case No. 11-CR-34S, 2020 WL 1482323, at *1 & n.1 (W.D.N.Y. Mar. 27, 2020) (same). The court agrees with the reasoning of these other courts.

By its plain terms, § 3142 is titled "Release or detention of a defendant *pending trial*" whereas § 3145 is titled "Release or detention of a defendant *pending sentencing* or appeal." (Emphasis added.) Section 3142(i) governs the content of a detention order issued under § 3142(e), which is a detention order "before trial." § 3142(e). The legislative history confirms that § 3145(c) applies to a defendant subject to mandatory detention pending sentencing whereas § 3142(i) does not. The language in § 3142(i) allowing for temporary release was included in the original provisions of the Bail Reform Act of 1984. *See* Bail Reform Act of 1984, Pub. L. 98–473, 98 Stat 1837 (1984). But Congress later enacted the Crime Control Act of 1990, including the Mandatory Detention Act in which Congress amended § 3143 to require mandatory detention for certain defendants awaiting sentencing and the "exceptional reasons" provision to § 3145(c)—essentially, "to provide an avenue for exceptional discretionary relief from [the mandatory detention] provisions." *United States v. Carr*, 947 F.2d 1239, 1240 (5th Cir. 1991) (citing Crime

10

Control Act of 1990, Pub. L. No. 101-647, § 902, 104 Stat. 4826, 4827 (1990)); *see also United States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003) (discussing the Mandatory Detention Act and noting that "[p]ersons subject to the 1990 Act are not eligible for release unless it is clearly shown that there are exceptional reasons why [their] detention would not be appropriate."); *see also United States v. Herrera-Soto*, 961 F.2d 645, 647 (7th Cir. 1992) ("The 'exceptional reason' provision § 3145(c) was added to the Bail Reform Act along with the amendment providing for mandatory detention in certain circumstances. It was therefore included as an avenue of relief from the mandatory detention provisions.") (internal citation omitted). If Congress had intended for § 3142(i)'s temporary-release provision to apply to post-conviction defendants detained pending sentencing, it did not need to add the exceptional-reasons provision to § 3145(c) because § 3145(c) imposes a higher standard for release than § 3142(i). Congress would not have enacted the more onerous § 3145(c) mechanism for seeking release when a lesser one was available under § 3142(i) because doing so would have had no practical effect. Defendants could simply move for release under the less onerous, pre-existing § 3145(i) standard, thus rendering § 3145(c) superfluous.

Mr. Duncan is now detained pursuant to § 3143(a)(2) pending sentencing after his guilty plea, and so § 3142(i) no longer applies.

### B. Mr. Duncan Has Not Shown Compelling Reasons Under § 3142(i)

Even if the court were to consider Mr. Duncan's motion under § 3142(i), he has not shown compelling reasons to justify his release. The parties have addressed the factors this court set forth in *United States v. Clark* to evaluate in deciding motions for release pursuant to § 3142(i) based on circumstances relating to COVID-19. No. 19-40068-01-HLT, 2020 WL 1446895 (D. Kan. Mar. 25, 2020). Those factors include the following:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or

11

> exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

*Id.* at *3. The above factors are non-exhaustive and are not necessarily weighted equally. *Id.*

### 1. Grounds for Mr. Duncan's Pretrial Detention

As explained above, ample grounds support Mr. Duncan being detained. This includes the magistrate judge's original decision that he poses a flight risk. And that decision has since been amplified by a risk of harm to others given his admitted recidivism (given his guilty plea) and his proposed release plan, which, as explained above, would expose numerous other individuals to increased COVID-19 risks. *See id.* (noting on a motion or temporary release under § 3142(i), the reasons for detention must be taken into consideration "in determining whether a defendant has presented such compelling reasons for temporary release that they effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order"). This factor weighs against release.

### 2. The Specificity of the Defendant's Stated COVID-19 Concerns

Mr. Duncan's COVID-19 concerns fall into two categories. First, he contends he is at an increased risk of contracting COVID-19 both generally because inmates are housed in closed quarters are at an increased risk of rampant infection and specifically in that CoreCivic's preventative measures are insufficient to prevent an outbreak. Second, Mr. Duncan contends that he is at an increased risk of suffering severe illness from COVID-19 because he is also HIV positive.

#### i. Increased risk of infection

Mr. Duncan contends that conditions of confinement create an ideal environment for an infectious disease to spread. He notes that inmates cycle in and out of detention facilities and that

correctional officers and care and service providers leave and return daily with little screening. He also argues that the prison population generally has poorer health than the general population and that many suffer from chronic medical conditions, making them more vulnerable to severe complications from COVID-19 infections. In support of these points, he submits the affidavit of Dr. Danielle C. Ompad, an associate professor of epidemiology at New York University School of Global Public Health, which details why the transmission risk in correctional settings is high. (ECF No. 61-1.) He also submits the declaration of Dr. Jonathan Louis Golob, a specialist in infections diseases and internal medicine and an assistant professor at the University of Michigan, which echoes Dr. Ompad's conclusions. (ECF No. 62-2.) The court does not minimize the accuracy of Dr. Ompad's and Dr. Golob's statements, but their opinions are not particularly helpful to resolution of the current motion because they are not tailored to Mr. Duncan or to the facility where he is housed. They are generally available to anyone on a website for public defenders.[1]

Mr. Duncan makes more particularized statements regarding CoreCivic. According to Mr. Duncan, although CoreCivic is screening inmates for symptoms during transport and upon admission, it has not implemented a screening procedure for the current population who may have developed symptoms after admission. He also states that CoreCivic has not implemented screening procedures for staff and visiting personnel who are only encouraged to stay home if they are sick but are not required to do so. He attributes this information to a "USMS email dated

---

[1] *See* ON POINT, WISCONSIN STATE PUBLIC DEFENDER , http://www.wisconsinappeals.net/on-point-by-the-wisconsin-state-public-defender/resources-for-defenders-during-the-pandemic/ (last visited Mar. 31, 2020). Among other things, the website provides practice materials for COVID-19-related motions including, "Affidavits from six physicians [including Ompad and Golob]– epidemiologists and specialists in health in correctional facilities–for use as motion exhibits. They contain good info on the high risk of severe illness for incarcerated people, and could support bond, sentence mod, or or stay motions." *Id.*

13

March 11, 2020, summarizing the guidance given by the CoreCivic corporate headquarters to all of their facilities yesterday." (ECF No. 58, at 7.) He also argues that CoreCivic lacks vital resources like disposable gloves, soap, hand sanitizer, and personal protective equipment for inmates handling the facility's laundry.

There are not yet any confirmed cases of COVID-19 at the facility where Mr. Duncan is housed. Additionally, CoreCivic has taken other measures (not addressed by Mr. Duncan) to minimize the risk of infection to inmates, including suspending social visitation. *See Clark*, 2020 WL 1446895, at *5 (describing measures taken by CoreCivic to protect against COVID-19 infections); *see also United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (denying release where there had been no reported incidents of COVID-19 within the facility and the Bureau of Prisons "is taking system-wide precautions to mitigate the possibility of an infection within its facilities").

Unquestionably, incarcerated individuals do not have the opportunity to avoid crowds or adhere to social distancing guidelines, and therefore they may be at a greater risk of infection in that respect. Mr. Duncan's specific concerns about inmates' lack of access to soap, hand sanitizer, personal protective equipment and other measures may also be valid, but many of these problems and shortages are being experienced by society generally. *See Clark*, 2020 WL 1446895, at *5 (noting that a lack of widespread COVID-19 testing is not unique to prison systems). But the fact that prisoners may face increased risks by virtue of confined quarters does not establish that a COVID-19 outbreak is imminent at the facility or that the facility would not be able to manage the medical needs of inmates who may contract the virus. Even non-confined individuals who are practicing appropriate mitigation efforts are still contracting the virus. It is *that* contagious. To

hold prison officials to an impossible standard of employing all possible measures to prevent the spread of the virus is not realistic or feasible.

A growing number of courts have rejected these types of generalized and speculative arguments on motions seeking release based on COVID-19 because they apply "equally to anyone in custody or, for that matter, at the halfway house or anywhere else in this community or any other," and because "the Court cannot release every detainee at risk of contracting COVID-19 because the Court would then be obligated to release every detainee." *United States v. Munguia*, No. 3:19-CR-191-B (03), 2020 WL 1471741, at *4 (N.D. Tex. Mar. 26, 2020); *see also United States v. Brown*, No. 08CR20115JARTJJ01, 2020 WL 1536544, at *5 (D. Kan. Mar. 31, 2020) (concluding that similar arguments were speculative); *United States v. Williams*, No. 13-544, 2020 WL 1434130, at *2 (D. Md. Mar. 24, 2020) ("The [motion] goes on to note that [detainees] are at special risk given their living situation. These are challenges that cannot be denied, but as they relate to the issue of release, they are concerns not concrete enough to justify the release of [the movant]."); *United States v. Jackson*, No. CR 18-216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) ("Defendant invites me to speculate that COVID-19 is present or imminent in the [facility] and, therefore, that his health conditions justify the extreme measure of releasing him to home detention pending sentence. I do not agree that such a release is warranted by the facts of this case, or the actual circumstances at the jail. Although I recognize the potential for exposure, that potential unfortunately exists anywhere in the community."). This court agrees that generalized concerns about the possibility of an outbreak at the prison are insufficient to justify release because they would logistically result in the wholesale release of all inmates—an unworkable solution to the hypothetical possibility. It appears to the court that the CoreCivic

facility at Leavenworth is using its best efforts to try to mitigate the COVID-19 risks to its employees and inmates, and that those efforts have been reasonably effective so far.

### ii. Increased risk of severe illness

Mr. Duncan makes more specific arguments regarding his HIV status. He cites the statement in Dr. Golob's declaration that, "As the Center [sic] for Disease Control and Prevention has advised, certain medical conditions increase the risk of serious COVID-19 for people of any age. These medical conditions include: those with lung disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV, autoimmune diseases)." (ECF No. 61-2 at ¶ 3.) It is unclear whether Dr. Golob bases this conclusion on his own knowledge or on guidance from the Centers for Disease Control and Prevention ("CDC"). Regardless, Mr. Duncan separately notes that the CDC has identified certain categories of people are at an increased risk for severe illness, including those who are immunocompromised. (ECF No. 58, at 3.)[2] But the CDC website he cites specifies that those with "*poorly controlled* HIV or AIDS" fit into the category of immunocompromised individuals who are at a higher risk for severe illness. (*Id.* (emphasis added)). As the government notes, the CDC itself states that presently "we have no specific information about the risk of COVID-19 in people with HIV," but those with a higher risk would be "[people] with a low CD4 cell count and [p]eople not on HIV treatment (antiretroviral therapy or ART)."[3] Mr. Duncan provides no information about the status of his particular HIV infection,

---

[2] Defendant cites CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html (last visited Mar. 31, 2020)).

[3] CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

16

such as whether he has a low CD4 count or is not being treated for his condition. On this record, the court cannot conclude that Mr. Duncan's HIV status places him at an increased risk for severe illness if he were to become infected. And, as explained above, the remainder of his arguments are too speculative or generalized to the entire prison population to support release.

### 3. The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate the Defendant's Overall COVID-19 risks

Defendants who seek release based on COVID-19 concerns must propose a release plan tailored to mitigate overall risks, not exacerbate then. *See Clark*, 2020 WL 1446895, at *6 (D. Kan. Mar. 25, 2020). In this case, Mr. Duncan proposes that the court release him to reside with his retired 78-year-old mother in St. James, Missouri, where he can quarantine and have complete access and control over his necessary mediation. On this record, the court cannot conclude that Mr. Duncan would be any better off if the court were to release him than he would be in the facility where he is housed.

Clearly, if the court released Mr. Duncan to his mother's residence, he would have the opportunity to isolate himself and practice social distancing. But, as the government notes, there are currently no known cases of COVID-19 in the facility where Mr. Duncan is housed while the number of cases in the District of Kansas is growing. The situation is even worse in Missouri, with more than 3,000 known cases.[4] Furthermore, Mr. Duncan's planned travel from Leavenworth to St. James carries its own risks. *See Clark*, 2020 WL 1446895, at *6 (considering the risks of

---

precautions/hiv.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhiv.html (last visited Mar. 31, 2020)).

[4] MISSOURI DEPARTMENT OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/results.php (last visited April 7, 2020).

17

travel). Additionally, if Mr. Duncan were to become infected, he does not address whether he would be able to secure better (or any) medical treatment in St. James. On balance, this factor is neutral. The court cannot speculate that Mr. Duncan's release plan would meaningfully minimize his risk of infection or complications.

### 4. The Likelihood that the Defendant's Proposed Release Pan Would Increase COVID-19 Risks to Others

As set forth above, Mr. Duncan's proposed release plan would significantly increase COVID-19 risks to others. As such, this factor weighs against release.

*****

On balance, Mr. Duncan has not shown a compelling reason such that his release is necessary under the *Clark* framework. There are sound reasons why Mr. Duncan was detained pending trial. Although Mr. Duncan may not have an opportunity to practice optimal social distancing at the facility where he resides, he risks exposure in other ways and a lack of access to adequate healthcare if he were released. So, it would be speculative to say that his proposed release plan necessarily mitigates rather than potentially exacerbates his overall health risks. Meanwhile, that release plan would increase the health risks to others. For these reasons, Mr. Duncan has not shown a compelling reason that his release is necessary.

## IV. CONCLUSION

Mr. Duncan has not shown by clear and convincing evidence that he meets the conditions of release § 3143(a)(1)—a threshold showing before the court even proceeds to the "exceptional circumstances" analysis under § 3145(c). Furthermore, § 3142(i) does not apply here and, even if it did, the court would not find that Mr. Duncan has shown a compelling reason that his release is necessary. For these reasons, the court denies his motion.

**IT IS THEREFORE ORDERED** that Defendant Bryan S. Duncan's Motion for Release from Custody Prior to Sentencing (ECF No. 58) is denied.

**IT IS SO ORDERED.**

Dated April 8, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
